UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CSX TRANSPORTATION, INC.,

        Plaintiff,

                                      CASE NO. 5:06-CV-138

v.

MESEROLE STREET RECYCLING, et. al.,

        Defendants.
_____/

MARQUETTE RAIL, LLC,

        Plaintiff,

                                      CASE NO. 1:06-CV-804

v.

VORTEX, INC., et. al.,

        Defendants.
_____/

MESEROLE STREET RECYCLING, INC.,

        Plaintiff,

                                      CASE NO. 1:07-CV-985

v.

CSX TRANSPORTATION, INC, et. al.,

        Defendants.
_____/

## **OPINION**

      This consolidated action consists of three separate cases.  The parties and claims in each case

overlap significantly.  Through a series of motions, multiple parties have moved for total or partial

summary judgment.  (Docket ## 198, 203, 204, 208, 210).  The Court heard oral argument on these motions on February 2, 2009.  (Docket # 281.)

## BACKGROUND

Meserole Street Recycling, Inc. ("Meserole") and Westbury Paper Stock Corporation ("Westbury") are recycling facilities in New York.  They receive various types of waste from businesses located in or near New York City.  Both entities separate waste into categories onsite at their respective facilities.  The "higher end" waste is sold in domestic and international recycling markets.  (Goldberg Declaration, docket # 200, at ¶ 8.)  Disposition of the lower grade waste depends on market conditions.  (*Id.*)  Meserole and Westbury incinerate or landfill any waste they cannot sell on the open market.  (*Id.*)  Both entities are regulated by the New York Department of Environmental Conservation, Division of Solid & Hazardous Materials.

Sometime in late summer or early fall of 2005, Meserole and Westbury made separate arrangements to have low grade "scrap paper" waste transported away from their facilities in New York to C&V Logistics ("C&V") in Manistee, Michigan. C&V is a Michigan company that at one time had a business plan for converting scrap paper into fuel pellets that could be burned for energy. Robert Geber and his company, Vortex, Inc., worked with C&V, Meserole, and Westbury to facilitate movement of the material from New York to Manistee.

CSX Transportation, Inc. ("CSX") is a national rail carrier.  Marquette Rail LLC ("Marquette") and New York & Atlantic Railway ("NY&A") are short-line partners of CSX. Operating under NY&A bills of lading and a CSX tariff, these three rail carriers agreed to transport low grade scrap paper from the Meserole and Westbury facilities in New York to C&V in Michigan. At the time shipping began, there was no resale market for low grade scrap paper.  (Meserole's

Response, docket # 230, at 17; Westbury's Brief in Support, docket # 205, at 4.)  Meserole and Westbury paid either Vortex or C&V to take the material off their hands.  (*Id.*)

I.    **Meserole's Relationship with Vortex**

In fall of 2005, Meserole and Vortex entered into an agreement covering the low grade paper waste located on-site at Meserole's facility.  Meserole promised to pay Vortex $49 for each ton of paper waste that left the Meserole facility.  (*Id.* at ¶ 4.)  Vortex and Meserole operated under this agreement from November 2005 to April 2006, during which time Meserole paid to Vortex approximately $575,000.  (*Id.*) Even though Meserole paid Vortex to handle the material, Meserole characterizes this agreement as a "sale" of its waste to Vortex.  (*Id.*, ¶¶ 19, 23, 51, 52.)  According to Meserole, Vortex agreed to "accept possession and title" of the paper waste and "pay all charges and costs" associated with moving the waste off the Meserole yard.  (Meserole Amended Complaint, docket # 85, at ¶ 86.)  Mr. Geber's understanding of the agreement differed from Meserole's. According to Geber,  he acted as Meserole's agent or broker in disposing of its paper waste.  (Geber at 291, 531.)   Ultimately, this difference in characterization is beside the point for this Court's summary judgment analysis.

Mr. Geber contacted CSX to obtain routing and rate information for the Meserole shipment. (Geber at 103-04.)  In response to Geber's inquiry, CSX provided a private price list labeled  "CSXT 7273.805."  (Mark Woodward Deposition at 223.)  The price list incorporated various CSX tariffs and included routing information and commodity rates for the trip from New York to Manistee. (CSX Brief in Support, docket # 206, Exhibit D.)  All parties agree that shipments leaving Meserole for C&V were subject to this price list and its accompanying tariffs.  (*See* Monopoli Affidavit, docket # 199, at ¶ 13; CSX Brief in Support, docket # 206, at 15.)

3

The first shipment of paper waste left Meserole for C&V in November 2005.  Mr. Geber helped facilitate that shipment – and all future shipments – by preparing a "template" bill of lading for Meserole.  (Geber at 137.)  Geber's template bill included the "basic information" for Meserole's shipments.  (Geber at 102.)  Specifically, Geber's bill listed the consignee, routing, commodity number, and "bill to" party.  (Geber at 101-02.)  Geber listed Meserole as the "shipper" and Vortex as the "Send Freight Bill To" party on the template bill.  (Geber at 101-03; Dominic Monopoli Deposition at 75.)  The template bill also included a space for the shipper to select "Section 7" protection.[1]  (*See* Monopoli Affidavit at ¶ 16.)  Geber left the "Section 7" box blank on the template bill.  (*See id.*)  The bottom of each template bill included a legend stating:

> This material is not putrescible solid waste.  It is the residual portion of source separated office paper waste recycling and is comprised of 99% paper, plastics and materials in a baled format.

(*See* Marquette's Brief in Support of its Motion for Summary Judgment, docket # 209, Exhibit H.)

Once he completed the template bill of lading, Geber faxed it to Meserole.  (Monopoli at 84.) Meserole used the template bill when preparing shipments destined for C&V.  (Monopoli at 76, 84, 300-05.)  Meserole employees loaded and sealed railcars on-site at the Meserole yard, and then filled in the car number, quantity, tonnage, PO number, and date for each car on a copy of Geber's template bill.  (Monopoli at 299-300.)  Dominic Monopoli, a corporate officer at Meserole, often would double-check the tonnage numbers supplied by his employees.  (Monopoli at 87-89.)  Mr. Monopoli personally initialed many of the bills prepared by Meserole.  (Monopoli at 87-89, 300-01;

---

[1] "Section 7" is a short-hand reference to Section 7 of the Uniform Bill of Lading codified at C.F.R. § 1035, Appendix B.  Under certain circumstances, a shipper may disclaim liability for future freight charges by checking the Section 7 selection on a bill of lading.

4

*see also* Marquette's Brief in Support, docket # 209, Exhibit H.)   No one from Meserole checked the "Section 7" box on any bill of lading.

After Meserole finished loading a railcar, Meserole faxed the completed bill of lading for that car to New York & Atlantic Railway.  (Monopoli at 306.)  Upon receipt of a completed bill, NY&A would send a locomotive to pick up the loaded car waiting on-site at the Meserole yard.  (Monopoli at 306.)  From November 2005 to April 2006, NY&A and its connecting carriers transported approximately 200 railcars of low grade paper waste off the Meserole lot.  (Meserole Amended Complaint, docket # 85, at ¶¶17, 20; s*ee also* Marquette Brief in Support, docket # 209, Exhibit C, Kevin Ruble Affidavit at ¶¶ 8, 14).  Meserole is listed as the "shipper" on all bills of lading corresponding to those shipments.  (*See* Marquette's Brief in Support, docket # 209, Exhibit H.) Meserole did not select the "Section 7 signed" box on any of those bills.  (*See id.*)

## II.    Westbury's Relationship with Vortex

In summer of 2005, Westbury began making plans to dispose of its low grade paper waste. Westbury's disposal arrangement differed from Meserole's arrangement.  Rather than pay Vortex to handle the waste, Westbury paid C&V to receive the waste.  (Geber at 516.)  Vortex would bill C&V for its efforts in arranging the shipments, and C&V remitted payment to Vortex, presumably at least in part out of the funds paid by Westbury.  (Geber at 516.)  The record does not indicate how much money flowed between Westbury, C&V, and Vortex under this payment arrangement, but Westbury asserts that it paid C&V in full.  (Westbury's Brief in Support of its Motion for Summary Judgment, docket # 205, at 4.)  No one contests that assertion.

The first shipment of Westbury paper waste left for C&V in November 2005.  Much like he had done for Meserole, Mr. Geber prepared a template bill of lading for Westbury to use in its

5

shipments to C&V. (Sisto Martello Deposition at 60-61.) The Westbury template bills contained substantially the same information as the Meserole template bills. (*See* Martello at 77-84.) After completing the template, Geber faxed it to Westbury. (Martello at 75.) Westbury employees added car-specific information to the template bill, including the date, shipper's bill of lading number, car initial number, weight, and number of bales for each car shipped. (Martello at 74-81; *see also* Westbury Brief in Support, docket # 205, Exhibit E.) No one at Westbury checked the "Section 7" box on any bill of lading.

Westbury employees baled and loaded the paper waste on-site at the Westbury facility. When Westbury needed an empty railcar to load, it contacted Mr. Geber at Vortex. (Martello at 51-52.) Westbury officials maintained regular contact with Mr. Geber throughout the loading and shipping process, but Westbury did not communicate directly with NY&A or CSX. (*See* Martello at 114-15.) Rather, Westbury faxed its bills of lading to Vortex, and Vortex contacted the rail carriers to request a locomotive for the Westbury yard. (*See* Martello at 62.) From late 2005 to April 2006, approximately fourteen railcars of low grade paper waste left Westbury for C&V in Michigan. (Westbury's Brief in Support, docket # 205, at 5.) Westbury is listed as the "shipper" on all bills of lading corresponding to those shipments. (*Id.*, Exhibit E.) Westbury did not select the "Section 7 signed" box on any of those bills. (*Id.*)

## III.   Movement of the Cargo and Applicable Tariffs

NY&A transported loaded railcars from the Meserole and Westbury facilities in New York to a nearby CSX interchange point. CSX transported the cars from that interchange point to Grand Rapids, Michigan. Marquette was responsible for transporting the cars from Grand Rapids to C&V in Manistee. CSX contends, and no other party appears to dispute, that all shipments from Meserole

and Westbury were subject to CSXT Price Sheet 7273.805, as well as CSX Tariffs 3342 and 8100. (*See* CSX Response, docket # 245, at 23.)

CSXT Price Sheet 7273.805 and CSX Tariff 3342 overlap in many respects. Both documents identify the commodity shipped as "scrap paper." (CSX Reply Brief, docket # 263, Exhibit A; Monopoli Affidavit, docket # 199, Exhibit 12.) Both documents contain terms and conditions generally applicable to all shipments. CSXT 7273.805 also includes "Division Sheets" with specific pricing and routing information for Meserole and Westbury shipments. The Division Sheets state:

> Shipments reaching destination but not unloaded, for reasons other than carrier error, may be returned to original shipping point via reverse route at the same price or at the price normally applicable for such return movements if lower.

(Westbury's Brief in Support, docket # 205, Exhibit A.) CSX Tariff 3342 contains a nearly identical provision. (*See* CSX Reply Brief, docket # 263, Exhibit A.)

CSX Tariff 8100 governs demurrage on CSX shipments. Demurrage is a "charge exacted by a rail carrier from a shipper or consignee on account of a failure to load or unload cars within the specified time frame prescribed by the applicable tariffs." *Union Pac. R.R. v. Ametek, Inc.*, 104 F.3d 558, 559 (3d Cir. 1997). CSX Tariff 8100, Item 8070 states, "Unless otherwise advised, in WRITING, that another party is willing to accept responsibility for demurrage, consignor at origin or consignee at destination will be responsible for payment of demurrage charges." (CSX Brief in Support, docket # 206, Exhibit R.) (emphasis in original). The tariff defines "consignor" as "The party in whose name a car(s) is ordered; or the party who furnishes forwarding instructions." (*Id.*)

## IV.    C&V's Operation in Manistee

From November 2005 to April 2006, Marquette received a combined 209 railcars from Meserole and Westbury. (Ruble Affidavit at ¶ 14.) Marquette was able to transport, and C&V was

7

able to unload, the first forty-five of those railcars.  (*Id.*)  However, C&V experienced a variety of problems with its pelletizing operation and was never able to follow through with its business plan. (Paul Corrado Deposition at 107-09.)  Because C&V could not pelletize the incoming loads, cars began to pile up on-site at C&V as early as December 2005.  (Rick Jany Deposition at 134.)

As railcars continued to pile up at C&V, Marquette began holding the newly arrived cars on its tracks while waiting for C&V to clear space in Manistee.  (Jany at 134-35.)  Marquette would notify C&V that a loaded car was waiting on the Marquette tracks somewhere near Manistee, and that the car was ready for unloading as soon as C&V had room.  Marquette refers to this notification process as "constructive placement."  (Jany at 134-35.)  Despite C&V's inability to timely unload the incoming cars, C&V never refused delivery of any of the cars actually or constructively placed by Marquette.  (Corrado at 120-22; Gary Varisto Deposition at 121-23.)  C&V did not want to stop the incoming shipments because it received payment from either Vortex or Westbury for each car of paper waste it received.  (Varisto at 63-64.)  C&V officers testified that they thought C&V would eventually "catch up" with the backlog of cars and successfully pelletize all the incoming waste. (*See* Corrado at 146-147; Varisto at 120-22.)

Marquette Freight Tariff 8000 states, "[D]emurrage shall accrue at a rate of $60.00 per car for each 24-hour period, or portion thereof, until car is released by Customer."  (Marquette Brief in Support, docket # 209, Exhibit O.)  Marquette informed C&V that, under the terms of Tariff 8000, demurrage was accruing on all actually and constructively placed cars.  (Corrado at 114-15; Varisto at 134-36.)  C&V never informed Vortex, Meserole, or Westbury that the cars were piling up or that demurrage was accruing on those cars.  (Corrado at 179; Varisto at 117.)  Throughout the winter of 2005 and early spring of 2006, Meserole and Westbury shipped far more cars than C&V could

8

handle, and the backlog of actually and constructively placed cars of low grade paper waste eventually grew to over 160 cars.

Marquette cooperated with C&V's attempts to find space for the cars. (Varisto 120-21.) Marquette officials were in daily contact with C&V employees throughout the unloading process. (Scott Fortier Deposition at 15.) Marquette and C&V even negotiated an "Agreement for Storage in Lieu of Demurrage." (Westbury Reply Brief, docket # 261, Exhibit K.) Under the terms of that agreement, Marquette agreed to accept $30 per day for each car stored on its tracks, rather than the standard $60 per day demurrage rate applicable under Marquette Freight Tariff 8000. C&V officers signed the agreement on April 1, 2006, and the agreement states that the reduced rate would be made retroactive to January 1, 2006. (Id.) However, no Marquette representative ever signed the agreement, and Marquette maintains that C&V never paid the negotiated amounts. (Marquette Supplemental Response, docket # 290, at 4.) Even assuming for purposes of argument that the Agreement was consummated and in effect between Marquette and C&V,[2] no other party ever joined the Agreement.

Marquette also attempted to resolve the problems with C&V by contacting Vortex. Marquette President and Chief Executive Officer Kevin Ruble met with Mr. Geber to discuss the situation in early April of 2006. (Ruble Deposition at 190-91.) Geber indicated that he "represented Meserole," and he assured Mr. Ruble that the problem would be "taken care of." (Ruble Deposition at 46-48, 51, 172.) Nevertheless, the backlog of cars on-site at C&V eventually become so great that

---

[2] The default judgment already entered in favor of Marquette and against C&V (Case No. 1:06-CV-804, docket # 50) is premised on an affidavit using the $60 per car demurrage rate contained in Marquette's tariff. (Case No. 1:06-CV-804, docket # 48, Exhibit 1, at ¶ 5.) The judgment establishes the facts on this issue in favor of Marquette, at least with respect to C&V.

the Manistee Fire Marshall instructed C&V to stop accepting delivery. (Fortier at 60; *see also* Corrado at 116-17.) On April 19, 2006, Marquette issued an embargo on any further shipments to C&V. (Marquette Brief in Support, docket # 209, Exhibit N.) The stated cause for the embargo was "Congestion/Accumulation." (*Id.*)

## V.   The Contents of the Railcars

The commodity code on the bills of lading classifies the Meserole and Westbury paper waste as "scrap paper." However, Meserole's internal specification sheet stated that the "typical composition" of a Meserole rail car was:

    25% - 35% Mixed Paper (Including Chipboard)
    15 % - 20% Cardboard
    40% - 50% Plastic
    5% - 10% Misc. (Cans, Wood)

(CSX Response, docket # 245, Exhibit D.) Additionally, Meserole President Rudolph Filiberto testified that approximately three to five percent of each bale of Meserole paper waste consisted of textiles. (Filiberto at 80.) Multiple persons who unloaded or observed the unloading of the Meserole and Westbury railcars confirmed the presence of materials inconsistent with the designation contained on the bills of lading. Those persons observed, amongst other things, rope, tires, light bulbs, empty drums, concrete, household waste, rotting garbage, tennis shoes, a couch, a fish head, VHS tapes, and other "commingled waste." (Fortier Deposition at 23-24, 43-44; Edward Seng Deposition at 38-40; Jeffrey Leavell Deposition at 13, 29; Scott Conradson Deposition at 85; Gabe Hall Affidavit at ¶¶ 5-8.) Pictures taken at various points in the unloading process are consistent with these witness' general descriptions. (*See* CSX Response, docket # 245, Exhibits F-K.)

On May 16, 2006, an employee from the Michigan Department of Environmental Quality ("MDEQ") inspected the C&V facility in Manistee and concluded that certain material there was "solid waste," not "scrap paper."  (Catherine Cline Deposition at 10, 17.)  The MDEQ believed that the additional Meserole and Westbury railcars held by Marquette and constructively placed with C&V also contained solid waste.  (Carrie Hardigan Deposition at 16-18, 22.)  MDEQ Enforcement Specialist Carrie Hardigan testified that the unloaded railcars contained some paper,"but they also contained large amounts of waste, way beyond what would be considered incidental."  (Hardigan at 24.)  Ultimately, Ms. Hardigan advised Marquette that if Marquette participated in unloading the cars at C&V, it could be liable for illegal dumping of solid waste.  (*Id.* at 26-28.)

## VI.    The Reverse-Routing from Manistee

Based on the statements made by MDEQ employees, Marquette determined that C&V would never be able to unload the remaining cars.  (Ruble Deposition at 89-91.)  According to Mr. Ruble, Marquette "knew we no longer had a viable consignee" because MDEQ officials informed him that C&V would "never, ever, ever"  get a permit to unload the paper waste.  (Ruble at 89-91.)  Consequently, Ruble decided that the 164 loaded railcars sitting at C&V's yard or on  Marquette's tracks would need to be reverse-routed back to Meserole and Westbury in New York.  (Ruble at 89.)  Ruble based his decision to reverse-route the cars on CSXT 7273.805, which authorized reverse-routing  on shipments "reaching destination but not unloaded for reasons other than carrier error."  (*See* Ruble Affidavit at ¶ 15; Ruble Deposition at 131.)

Marquette informed C&V, Vortex, Westbury, and Meserole of its decision to reverse-route the cars.  In a May 17, 2006 fax to Vortex, Westbury, and Meserole, Ruble wrote:

11

> Our railroad's ability to effectively serve its customers has been severely constrained
> by the presence of 164 railcars of waste paper consigned to C&V Logistics AKA
> Alternative Fuel Providers at Manistee, Michigan. While the flow of cars was
> stopped with an embargo issued on April 19, 2006, the consignee's continued
> inability to unload these cars leaves us with no alternative but to return the cars to
> you as shippers immediately, pursuant to terms of CSXT price sheet 7273-805.

(Marquette's Supplemental Appendix, docket # 248, Exhibit Z.)   The record is unclear as to the

exact date reverse-routing began, but Marquette eventually reverse-routed all 164 unloaded railcars

back to Grand Rapids for interchange with CSX. 153 of those cars contained Meserole paper waste;

eleven cars contained Westbury paper waste. (Ruble at 130, 303.)

CSX took control of the 164 reverse-routed cars in Grand Rapids. CSX intended to

interchange the cars with NY&A in New York, but NY&A refused to accept the cars because

Meserole and Westbury were incapable of unloading such a large quantity of cars, and NY&A did

not have room on its track to store the cars. (CSX Supplementary Reply Brief, docket # 277, Exhibit

A, Joel Torres Affidavit at ¶¶ 6-8.) CSX attempted to contact Meserole to make alternative

arrangements for disposition of the cars, but Meserole was non-responsive. On June 9, 2006, CSX

notified Meserole that CSX deemed the cars "abandoned" and would arrange to have the contents

of the cars disposed of at Meserole's expense. (*See* CSX Brief in Support, docket # 206, Exhibit A.)

CSX sent follow-up letters to Meserole throughout June and July of 2006, but Meserole refused to

take the cars back. (*See id.*; *see also* Monopoli at 293.)

None of the reverse-routed cars were ever delivered to Meserole or Westbury. CSX stored

the cars on its tracks while searching for a potential purchaser of the cargo. (Mark Woodward

Deposition at 86-88, 102-03.) However, there was no market for low-grade paper waste at that time.

(Monopoli Affidavit, docket # 199, at ¶ 24.) Because the paper waste had no resale value, CSX

searched out a landfill or disposal facility that could receive the waste. Ultimately, CSX paid to have the contents of the reverse-routed cars incinerated at facilities in Niagra Falls, New York and Telogia, Florida. (CSX Response, docket # 245, Exhibit L, Woodward Affidavit, ¶ 8.)

## VII.  Procedural History and Summary of Claims

On August 28, 2006, Meserole filed in the Eastern District of New York a complaint against CSX, Marquette, Vortex, Geber, and C&V. (Case No. 1:07-CV-985, docket # 1.) On September 26, 2006 CSX filed in this court a complaint against Meserole, Westbury, and C&V. (Case No. 5:06-CV-138, docket # 1.) The next day, Marquette filed a motion to dismiss or transfer the New York action to this court. (Case No. 1:07-CV-985, docket # 5; *see also* CSX Motion to Dismiss or Transfer, docket # 13.) The New York court granted in part the motion to dismiss, and then granted the motion to transfer. (*Id.*, docket # 78.) On November 7, 2006, Marquette filed in this court a complaint against Meserole, Westbury, Vortex, Filco Carting, Inc.,[3] and C&V. (Case No. 1:06-CV-804, docket # 1.) Shortly thereafter, this Court issued an order consolidating the three actions. (Case No. 5:06-CV-138, docket # 50.)

### A.  CSX's Claims

CSX alleges Meserole and Westbury breached their transportation contracts and defrauded CSX by "shipping freight other than waste paper" or "misidentifying the actual freight on the bills of lading." (*See* CSX Second Amended Complaint, docket # 70.) CSX seeks recovery of disposal, cleaning, and storage costs, as well as unpaid freight charges. In addition to the contract and fraud

---

[3] Filco Carting, Inc. ("Filco") gathers "waste paper" for delivery to the Meserole facility. (Goldberg Declaration, docket # 200, at ¶ 8.) Filco is the entity that actually paid Vortex for the Meserole shipments. (*Id.*, ¶ 21.) The record is somewhat unclear on the relationship between Meserole and Filco, but it appears that Meserole corporate officers Rudolph Filiberto and Dominic Monopoli also owned or controlled Filco. (*See* Monopoli at 359.)

13

claims, the Second Amended Complaint also includes separate counts for demurrage and "storage costs." CSX does not articulate how "storage costs" differ from demurrage. C&V is a named Defendant only in the "storage costs" count of the Amended Complaint. (*Id.,* Count IX).

### B.      Marquette's Claims

Marquette alleges Meserole and Westbury breached their transportation contracts and defrauded Marquette by shipping "solid waste" rather than "scrap paper." (Marquette Amended Complaint, docket # 87.) Marquette makes these same allegations against Mr. Geber and Vortex. Like CSX, Marquette asserts a separate count for demurrage. Marquette already has obtained a default judgment in the amount of $998,049.80 against C&V. (Case No. 1:06-CV-804, docket # 50.)

### C.      Meserole's Claims

Meserole alleges CSX, Marquette, and NY&A are liable under the Carmack Amendment, 42 U.S.C. § 11706, for damaging, misdelivering, or failing to deliver its paper waste to C&V in Manistee. (Meserole Amended Complaint, docket # 85.) Meserole further alleges that CSX and Marquette defrauded Meserole by encouraging it to ship more waste to C&V despite C&V's troubles unloading the waste. The Amended complaint also includes fraud claims against Vortex, Geber, and C&V, as well as contract claims against Vortex and Geber.

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); FED. R. CIV. PROC. 56(c). An issue of fact is "genuine" if a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 284. In considering a motion for

14

summary judgment, the Court must draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The ultimate question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Jones v. Potter*, 488 F.3d 397 (6th Cir. 2007).

## ANALYSIS

### I.      Subject Matter Jurisdiction

This Court has subject matter jurisdiction over the consolidated action under 28 U.S.C. §§ 1331 and 1367. There are two federal claims on the face of the Meserole Amended Complaint (docket # 85, Counts I and VII),[4] and all other claims by all other parties fall within this Court's supplemental jurisdiction. *See* 28 U.S.C. § 1367. The Court previously denied a subject matter jurisdiction challenge in its July 3, 2008 Order. (*See* Docket # 149.) The reasoning for the Court's decision in that order was fully explained at the July 2, 2008 hearing addressing the parties' motions to dismiss. (*See* Transcript of July 2, 2008 Hearing, docket # 189.) It continues to apply.

### II.     General Overview of Applicable Law

All claims in this case focus on the meaning and impact of the bills of lading. "The bill of lading is the basic shipping contract between the shipper-consignor and the carrier." *S. Pac. Transp. Co. v. Commercial Metals Co.*, 456 U.S. 336, 342 (1982). A rail carrier must issue a bill of lading for any property received for interstate shipment. *See* 49 U.S.C. § 11706(a). A bill of lading has three purposes: (1) it records that a carrier has received goods from the party that wishes to ship

---

[4] The Court dismissed one of those federal claims in an August 12, 2008 Opinion and Order. (*See* docket # 163.)

them; (2) it defines the terms governing the carriage; and (3) it serves as evidence of the contract for carriage. *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 18-19 (2004). The bill of lading and all accompanying tariffs contractually bind the original shipper and all connecting carriers. *Southern Pacific*, 456 U.S. at 342; *see also* 1 Paul Sorkin, GOODS IN TRANSIT, § 2.05[2] (2008).

CSX and Marquette assert that Meserole and Westbury, as parties to the bills of lading, are liable for all charges associated with shipments moving under those bills. Meserole and Westbury counter that (1) they are not parties to the bills of lading; and (2) even if they are parties to the bills, CSX and Marquette cannot collect unpaid freight or demurrage charges from them. Meserole also asserts a Carmack Amendment claim against CSX and Marquette. (Meserole Amended Complaint, docket #85, Count I.) The Carmack Amendment provides a shipper with a federal cause of action for "actual loss or injury" to interstate freight. 49 U.S.C. § 11706(a)(1). Meserole argues that its designation as "shipper" on the bills of lading entitle it to pursue a Carmack Amendment claim for lost or damaged cargo, despite its assertion that it no longer owned the cargo at the time of shipment.

## III.   Demurrage and Reverse Routing Expenses Under CSX and Marquette Tariffs

A key issue in this case is who bears responsibility for the demurrage and reverse-routing fees incurred by CSX and Marquette (collectively "the carriers"). Meserole and Westbury argue the carriers may recover these charges only from C&V or Vortex. The carriers argue they may collect from either C&V, Meserole, or Westbury. CSX, Marquette, Meserole, and Westbury each move for summary judgment on this issue.

As a general rule, the shipper-consignor is primarily liable for all charges associated with the shipment of cargo, including demurrage. *Southern Pacific,* 456 U.S. at 342-43 (1982). 4 Sorkin, at § 25.02[3]. The parties to the bill of lading – the shipper, the carrier, and the consignee – are free

16

to alter this default rule of shipper liability and shift payment responsibility to a third party. *Oak Harbor Freight Lines, Inc. v. Sears Roebuck Co.*, 513 F.3d 949, 954-55 (9th Cir. 2008). However, absent an express statement on the face of the bill of lading or a separate agreement allocating liability, the shipper-consignor remains presumptively liable for all lawful freight charges. *Southern Pacific*, 456 U.S. at 343; *Oak Harbor*, 513 F.3d at 954-55. Under the general rule, Meserole and Westbury are presumptively liable for all lawful freight charges in this case, including demurrage and reverse routing.

Meserole and Westbury argue they are not liable under the bills of lading because Vortex is the "shipper" or "consignor."[5] This argument is without merit. To determine who is the shipper-consignor the Court first looks to the bill of lading, "bearing in mind that the instrument serves both as a receipt and as a contract." *See Louisville & Nashville Railroad*, 265 U.S. at 67. All bills of lading on record in this case list either Meserole or Westbury as the "shipper." This fact alone would be sufficient to support a finding that Meserole and Westbury are presumptively liable for the freight and demurrage charges associated with those bills. *See Southern Pacific*, 456 U.S. at 343-44

---

[5] Meserole and Westbury attempt to draw a distinction between the terms "shipper" and "consignor," arguing that CSX and Marquette may recover only from the "consignor." Neither party cites any authority explaining how the terms might differ, and courts appear to use the two terms interchangeably. *See, e.g.*, *Southern Pacific*, 456 U.S. at 342 ("The bill of lading is the basic transportation contract between the shipper-consignor and the carrier; its terms and conditions bind the shipper and all connecting carriers."); *Oak Harbor*, 513 F.3d at 954 (referring to the "shipper/consignor" as a single entity). To the extent the two terms differ at all, that difference reflects that "consignor" is sometimes used as a legal conclusion intended to impose liability on the real party in interest to the transportation contract. *See, e.g.*, *Louisville & Nashville R.R. Co. v. Cent. Iron & Coal Co.*, 265 U.S. 59, 67 (1924) ("[T]he shipper is presumably the consignor, the transportation ordered by him is presumably on his own behalf, and a promise by him to pay therefor is inferred.") Meserole's and Westbury's argument that they are not the real party in interest to the bills of lading is discussed throughout this opinion, and the Court's analysis of liability under those bills does not turn on any perceived factual distinction between a "shipper" and a "consignor."

(holding that a party listed as "consignor" on a bill of lading is presumptively liable for freight charges); *see also CSX v. Novolog Bucks Co.*, 502 F.3d 247, 261-63 (3d Cir. 2007) (discussing consignee and consignor liability for demurrage), *cert. denied*, 128 S. Ct. 1240 (2008). But Meserole's and Westbury's involvement with the shipments in question goes far beyond the face of the bills of lading. Meserole and Westbury employees loaded the paper waste onto railcars onsite at their respective facilities. The waste, at least originally, belonged to Meserole or Westbury when they received it from their customers. Indeed, Meserole and Westbury paid Vortex or C&V to remove the material from their sites, thus saving Meserole and Westbury the cost of dumping the material in a landfill, incinerating it, arranging for indefinite storage on their own sites (if even permitted to do so by regulators), or otherwise disposing of the unwanted material. Meserole and Westbury employees entered information on a bill of lading for each shipment and contacted either Vortex or NY&A when a railcar was loaded and ready to be shipped. On this record, the Court finds that, as a matter of law, Meserole and Westbury were the "shippers" or "consignors" of all shipments relevant to this case. Thus, Meserole and Westbury are presumptively liable for all tariff freight charges associated with those shipments, including demurrage. *See Southern Pacific,* 456 U.S. at 342; 4 Sorkin, at § 25.02[3].

## A.     The Bills of Lading Do Not Evidence a Release of Liability

The initial presumption of liability that attaches to Meserole and Westbury as shippers or consignors is not absolute. In *Louisville & Nashville Railroad*, the Supreme Court held that the shipper can rebut this presumption by showing that (1) it was not acting on its own behalf; (2) this fact was known by the carrier; (3) the parties intended another person assume the primary obligation to pay; and (4) the parties intended that the shipper or consignor "should not assume any liability

whatsoever." 265 U.S. at 67-68; *see also Southern Pacific*, 456 U.S. at 343.  As a matter of modern practice, the shipper can satisfy the *Louisville & Nashville Railroad* standard simply by checking the Section 7 nonrecourse clause on the bill of lading.  *See Southern Pacific*, 456 U.S. at 343; *Mo. Pac. R.R. Co. v. Cent. Plains Indus., Inc.*, 720 F.2d 818, 819 (5th Cir. 1983); 49 C.F.R. § 1035, App. B. The Ninth Circuit recently explained the effect of the nonrecourse clause as follows:

> The [uniform] bill of lading provides that the owner or consignee shall pay the fright and all other lawful charges upon the transported property and that the consignor remains liable to the carrier for all lawful charges. The bill of lading, however, also contains "nonrecourse" and "prepaid" provisions that, if marked by the parties, release the consignor and consignee from liability for the freight charges.  If the nonrecourse clause is signed by the consignor and no provision is made for the payment of freight, delivery of the shipment to the consignee relieves the consignor of liability.

*Oak Harbor Freight Lines, Inc. v. Sears Roebuck & Co.*, 513 F.3d 949, 954-55 (9th Cir. 2008).

All bills of lading at issue in this case included a box allowing the shipper to avail itself of the Section 7 nonrecourse protections.  Neither Meserole nor Westbury (collectively "the shippers") checked that box on any of the bills.  The shippers argue that the bills of lading release them from liability because Vortex is listed in the "Send Freight Bill To" box on the bills, but this is incorrect. The Fifth Circuit rejected a nearly identical argument in *Missouri Pacific*, stating:

> Typically, transfer of responsibility for payment of shipping charges is done by the shipper exercising the privilege made available by Section 7 of the Contract Terms and Conditions printed on the reverse side of the bill of lading by the simple expedient of marking the Section 7 box on the bill of lading.  Center Plains seeks to avoid liability by noting that each bill of lading had typed thereon "Send Freight Bill To," followed by the name and address of a third party.   We are not persuaded that this simple glossation, in the circumstances as found by the trial court, is sufficient to transfer the obligation of payment. Nor are we persuaded that Missouri Pacific is barred by estoppel from collecting the freight charges.

720 F.2d at 819; *see also Oak Harbor*, 513 F.3d 949 (finding the shipper liable even though the bills of lading instructed the carrier to send the freight bill to a third-party broker).

The reasoning in *Missouri Pacific* and *Oak Harbor* is consistent with overall purpose of the common carrier regulatory scheme. Federal regulation of interstate rail shipments was intended to establish "clear, easily enforceable rules for liability." *CSX v. Novolog Bucks Co.*, 502 F.3d 247, 257 (3d Cir. 2007). The uniform bill of lading furthers this purpose by creating default standards for liability, while still allowing the parties to contract around those standards by the "simple expedient" of checking the Section 7 nonrecourse box on the face of the bill of lading. *Missouri Pacific*, 720 F.3d at 819. The uniform bill of lading in general, and Section 7 in particular, loses its utility if, as Meserole and Westbury argue, the carrier cannot rely on unambiguous representations contained on the face of the bill in determining how to allocate liability for freight charges. *See id.*; *Cf. CSX*, 502 F.3d at 260 (rejecting a liability regime under which "carriers would be forced to second guess their bills of lading and perform indeterminate weighing tests to determine who is to be charged").

In this case, the shippers' after-the-fact rationalization of the import of the "Send Freight Bill To" box is exactly the situation the uniform bill of lading was designed to prevent. *See Oak Harbor,* 513 F.3d at 955-56. After failing to use the standard release provision by checking the nonrecourse selection, Meserole and Westbury now argue the "Send Freight Bill To" box has the same effect as Section 7. This argument fails because the shippers present no evidence that the carriers understood the "Send Freight Bill To" designation to limit in any way their ability to collect freight or demurrage charges from the shippers. *See Louisville & Nashville Railroad,* 265 U.S. at 68 (stating that the shipper must show "the parties intended . . . that the shipper should not assume any liability whatsoever" for the charges); *see also Southern Pacific*, 456 U.S. at 336 (stating that the shipper must show the circumstances of the shipment "clearly indicate" the parties intended to exempt the shipper from liability). At most, the bills of lading show that the carriers expected payment from

either Vortex or the shippers; they do not "clearly indicate" the carriers intended to release the shippers from all liability.  *See id.*

　　As with any other contract, where the terms of a bill of lading are unambiguous, the Court must give effect to the parties' intentions as expressed in those terms.  *See*, *e.g.*, *EF Operating Corp. v. American Bldgs.*, 993 F.2d 1046, 1050 (3d Cir. 1993) (stating that a bill of lading is "subject to general rules of construction under contract law"); *see also Oak Harbor*, 513 F.3d at 955 (noting that, absent an agreement to the contrary, the default terms of the uniform bill of lading bind the parties).  The terms of the Meserole and Westbury bills of lading are clear.  The shippers failed to make a Section 7 nonrecourse selection, and the "simple glossation" of the "Send Freight Bill To" designation is insufficient to relieve them of liability.  *See Missouri Pacific*, 720 F.3d at 819.  The carriers have established a prima facie case of liability under the bills of lading, and the shippers bear the burden of proving an affirmative defense that would bar the carriers from collecting freight and demurrage charges.  *See Southern Pacific,* 546 U.S. at 344; *Oak Harbor*, 513 F.3d at 955.

### B.　　There is No Separate Contract Between the Carriers and Shippers Releasing the Shippers From Liability Under the Bills of Lading.

　　Meserole and Westbury argue that the Court should disregard the presumption of liability that attaches to the bills of lading because the parties made separate arrangements for the payment of freight and demurrage charges.  This argument is without merit.  The parties to a bill of lading may allocate payment responsibilities through a contract separate from the bill.  *See, e.g., Oak Harbor*, 513 F.3d 94. However, where a shipper seeks to avoid liability by alleging the existence of a separate contract the shipper must show not only that a third-party assumed an obligation to pay, but also that the carrier agreed to release the shipper from all liability.  *Id.*; *Louisville & Nashville Railroad*, 265 U.S. at 68.

21

Meserole and Westbury effectively concede they had no express pre-shipping payment agreement with the carriers. In fact, all parties agree that the shippers and carriers did not communicate at all prior to movement of the cargo. The shippers appear to argue that their dealings with Vortex or Vortex's dealings with the CSX somehow released them from liability on the bills. As the *Oak Harbor* Court noted, there is "no support" for the proposition that a contract between a broker and a shipper or a broker and a carrier can upset the default presumption of liability attached to a bill of lading. 513 F.3d at 956. Regardless of whatever promises Mr. Geber may have made to the shippers, he had no authority to waive CSX's or Marquette's rights under the bills of lading. *See*, *e.g.*, *EEOC v. Franks's Nursery & Crafts, Inc.*, 177 F.3d 448, 460 (6th Cir. 1999) ("One individual cannot waive the statutory rights of one who is not a party to the contract."). Similarly, the carriers' dealings with Vortex do not relieve Meserole or Westbury from liability under the bills of lading. Even if the carriers relied on Vortex as their primary contact for the Meserole and Westbury shipments, there still is no evidence the carriers ever agreed to limit their right of collection to Vortex alone.[6] Absent such an agreement, the carriers' relationship with Vortex is immaterial to the shippers' liability under the bills of lading. *See Oak Harbor*, 513 F.3d at 956-57 (holding that an agreement between a broker and carrier did not absolve the shipper of liability under the bills of lading even where the broker expressly agreed to be liable for the shipper's freight charges).

Meserole and Westbury also argue that the putative storage agreement between Marquette and C&V terminated whatever existing liability they had under the bills of lading. Westbury raised this argument for the first time in its final reply brief (docket # 261), and Meserole raised it for the

---

[6] The carriers' approach is understandable in light of the fact that Geber consistently represented to them that he was the agent for Meserole and Westbury. (Geber at 90, 291, 531).

first time at oral argument.  The storage agreement, entitled "Agreement for Storage in Lieu of

Demurrage Pursuant to 49 U.S.C. § 10502 or § 10709," states:

> This agreement applies to the assessment of applicable storage charges by Marquette
> Rail in lieu of demurrage charges, and the payment of such charges by C&V.  Except
> as otherwise provided herein, the provisions of Marquette Rail tariff MQT 8000 as
> amended or superseded during the term of this Agreement (the "MQT 8000 Tariff"),
> are incorporated herein by reference.

(Westbury Reply, docket # 261, Exhibit K)  As a threshold matter, the Court notes that the express

terms of the agreement belie the shippers' argument.  The agreement is limited to "payment of such

charges by C&V."  There is no indication that Marquette intended to waive its own, or for that matter

CSX's, right of recourse against Meserole or Westbury for the same charges.  *Cf.* 4 Sorkin, at §

25.02[3] (noting that a carrier may collect demurrage from a consignee or a consignor).  In fact, the

agreement does not include any reference at all to either CSX, Meserole or Westbury.

Rather than addressing the plain language of the storage agreement, the shippers argue that

the mere existence of a post-shipping contract terminates the original bills of lading in their entirety.

According to the shippers, the storage agreement is a "Staggers Act agreement" that terminates the

"Carmack Amendment contract of carriage."  (Meserole Supplemental Brief, docket # 284, at 3-5.)

This argument fails for two reasons.  First, the shippers overstate the reach of the Staggers Rail Act

of 1980.  That act partially deregulated the rail industry by allowing carriers to offer private

contracted-for freight rates that differ from their public tariffs.  *See* 49 U.S.C. §§ 10502, 10709;

*Sompo Japan Ins. Co. v. Norfolk S. Ry. Co.*, 540 F. Supp. 2d 486, 492 (S.D.N.Y. 2008).  It does not

state or even imply that a so-called "Staggers Act contract" automatically terminates all obligations

under an existing bill of lading.[7]  Second, CSX, Meserole, and Westbury were not parties to the

storage agreement.  The parties to a bill of lading may agree to terminate their obligations under the

bill before delivery is complete, *Wabco Trade Co. v. S.S. Inger Skou*, 482 F. Supp. 444, 447

(S.D.N.Y. 1979), but one who is not a party to the termination agreement cannot be bound by it.  *Cf.*

*Franks's Nursery*, 177 F.3d at 460 ("[I]t is axiomatic that courts cannot bind a non-party to a

contract, because that party never agreed to the terms set forth therein.").  The shippers fail to cite,

and this Court is not aware of, any case where a delivering carrier's unilateral agreement with a

consignee was found to terminate the rights of a connecting carrier or the obligations of the original

shippers.  Consequently, the Court holds that the storage agreement between Marquette and C&V

– even assuming for purposes of argument that it ever went into effect – does not affect the carriers'

ability to collect freight and demurrage from Meserole and Westbury.

> **C.**     **Equitable Estoppel Does Not Bar the Carriers from Collecting Freight or Demurrage Charges from Meserole and Westbury.**

The shippers argue that, even if they are otherwise liable on the bills of lading, the carriers

are equitably estopped from collecting freight and demurrage charges from them.  The gravamen of

the shippers' argument is that forcing them to pay freight and demurrage charges is unfair because

(1) C&V and Vortex caused those charges to accrue; and (2) CSX's payment arrangement with

Vortex led the shippers to believe they would never have to pay the carriers for their shipments.

A railcarrier's ability to collect demurrage from a shipper does not depend on a finding that

---

[7]  In fact, the real import of the Staggers Act is that it allows carriers to limit their liability for freight damages or loss by exempting certain transportation contracts from shipper-friendly regulatory schemes like the Carmack Amendment.  *See Sompo*, 540 F. Supp. 2d at 495-96; *see also Glen Hunter & Assocs. v. Union Pac. R.R. Co.*, 135 Fed. Appx. 849, 854 (6th Cir. 2005).  Neither Meserole nor Westbury cite any authority for the proposition that a Staggers Act contract limits a carrier's ability to collect freight charges or demurrage from a shipper.

the shipper was at fault. *Union Pac. R. Co. v. U.S.*, 490 F.2d 1385, 1389 (Ct. Cl. 1974). As a matter of businesses policy, a railcarrier may first attempt to recover demurrage from the party actually responsible for the delay. 4 Paul Sorkin, GOODS IN TRANSIT, § 25.02[3]. "But the fact that the carrier may initially bill one party rather than another does not affect the carrier's rights, subject to Section 7, to collect from either the consignor or consignee or both." *Id.* This liability regime furthers the overall purpose of demurrage and reflects the proper risk allocation between the parties to a bill of lading. Demurrage is a penalty designed to incentivize consignors and consignees to deal with their goods, and to return railcars to transit. *CSX v. Novolog Bucks Co.*, 502 F.3d 247, 258-59 (3d Cir. 2007). Where, as here, a consignee delays in unloading railcars, neither the carrier nor the consignor may be in a position to expedite the unloading process, but only the consignor had the luxury of vetting the consignee prior to shipment. The shipper, not the carrier, chooses the consignee. *Cf.* 49 U.S.C. § 1101 (stating that a carrier "shall provide" transportation service "on reasonable request"). If demurrage is to serve fully its purpose, the carrier must retain the right to collect unpaid charges from either the consignee or the consignor, regardless of who is at fault. *See* 4 Sorkin, at § 25.02[3].

In this case, neither CSX Tariff 8000 nor Marquette Tariff 8100 contains a fault element for demurrage or reverse-routing. Meserole and Westbury are charged with knowledge of those tariffs. *See Norton v. Jim Phillips Horse Transp., Inc.*, 901 F.2d 821, 824 (10th Cir. 1990). Even if the Court assumes the shippers are not at all at fault for the eight-month-long logjam of hundreds of cars of paper waste on CSX and Marquette tracks, the carriers still are entitled to collect demurrage and reverse-routing expenses from them under the applicable tariffs. *See* 4 Sorkin, § 25.02[3]; *Union Pacific*, 490 F.2d at 1389. Contrary to the shippers' assertions, the carriers' decision to pursue their

full panoply of rights under the bills of lading is not grounds for a finding of equitable estoppel. Enforcing the demurrage and reverse routing provisions of the applicable tariffs keeps the incentives of the parties properly aligned.  It encourages the parties responsible for dealing with the goods to handle the goods in an expeditious and responsible fashion, and it permits the carriers to focus on their mission and expertise of moving other parties' property from one place to another.

The shippers rely on *Olson Distributing Systems v. Glasurit America* for the proposition that a carrier is estopped from collecting freight charges if the carrier "lull[ed] the shipper into believing that it was expecting and receiving payment from the freight forwarder." 850 F.2d 295, 296 (6th Cir. 1988). But this case is unlike *Olson* because this is not a so-called "double payment" case. In *Olson*, the shipper paid all applicable charges to a freight forwarder and the freight forwarder absconded with the money without paying the carrier. *Id.* at 295-96.  The court there was forced to decide whether the shipper would pay twice or whether the carrier would receive no payment at all.  *Id.* Here, neither Meserole nor Westbury nor Vortex has paid any money to anyone for the demurrage or reverse-routing expenses. Therefore, the equitable concerns expressed in *Olson* simply are not present in this case.[8]  *See id.*; *see also Southern Pacific*, 456 U.S. 351 ("We find that these double payment cases constitute their own category and stand against the placement of duplication of liability on an innocent party.").

Even if this were a "double-payment" case, equitable estoppel still is inappropriate because the shippers fail to identify any false or misleading statements or other "dilatory conduct" on the part

_____

[8] CSX asserts that Meserole owes an additional $82,894 for the original shipments from New York to Manistee. (CSX Response, docket # 245, at 30.)  Meserole claims it paid Vortex in full for the westbound freight movement.  To the extent Meserole argues that CSX is estopped from collecting these charges because recovery would result in a double payment, that argument is rejected for the reasons explained below.

of the carriers. *See Olson*, 850 F.2d at 295; *see also Oak Harbor Freight Lines, Inc. v. Sears Roebuck & Co.*, 413 F.3d 949, 958-59 (9th Cir. 2008) (distinguishing *Olson* on its facts, and referring to it as "an outlier"). The shippers allege the carriers purposely let the backlog of cars grow so they could claim greater demurrage charges, but the record indicates otherwise beyond a genuine dispute. Marquette was in continuous contact with C&V throughout the unloading process. C&V officers testified that Marquette wanted the cars unloaded. (Corrado at 116.) As the backlog became worse, Marquette officials contacted Geber in an attempt to remedy the problem. Geber represented to Marquette that the pileup would be taken care of. (Ruble at 46-48, 51, 172.) Ultimately, Geber failed to fix the problem and C&V went out of business. Absent some type of misconduct, a carrier does not bear the risk of loss when the consignee or broker fails to perform. As the *Oak Harbor* Court stated: "[T]he shipper, and not the carrier, is in the best position to avoid liability for double-payment by dealing with a reputable freight forwarder, by contracting with the carrier to eliminate the shipper's liability, or by simply paying the carrier directly." 513 F.3d at 959; *see also Spedag Am., Inc. v. Petters Hospitality and Entm't Group*, *LLC*, 2008 WL 3889551, at *6 (S.D. Fla. 2008) ("It makes sense to put the assumption of risk on the shipper.") There is no evidence on this summary judgment record of such misconduct by the carriers.

In conclusion, the Court holds that, as a matter of law, Meserole and Westbury are liable for all demurrage and freight expenses due under CSXT Price Sheet 7273.805, CSX Tariffs 3342 and 8100, and Marquette Freight Tariff 8000. Such expenses include unpaid freight charges actually associated with the reverse-routing, (e.g. Marquette's reverse routing from Manistee to Grand Rapids) but do not include freight charges incurred or charged by CSX after CSX deemed the cars "abandoned" on June 9, 2006. At oral argument counsel for CSX conceded that at least some of his

client's claimed freight charges are attributable only to CSX's efforts to dispose of the paper waste, not to any legitimate attempt to send the waste back to Meserole and Westbury in New York. (February 2, 2009 Transcript, docket # 298 at 75-79.)  Such freight charges, as well as actual disposal and cleanup costs, may be recoverable under a breach of contract theory (Section IV below), but neither CSX nor Marquette has identified a specific tariff item directly applicable to those charges, and so they cannot be a part of the summary judgment ruling on the demurrage and reverse routing charges under the tariff.[9]

## IV.    CSX's and Marquette's Contract Claims

CSX and Marquette claim the shippers breached their transportation contracts by shipping cargo different from that described on the bills of lading. (CSX Second Amended Complaint, docket # 70, Counts I-IV; Marquette Amended Complaint, docket # 87, Counts VI-VI.) The carriers seek recovery of all costs associated with cleaning and disposing of the Meserole and Westbury cargo, including freight charges incurred while moving the cargo from Manistee to disposal facilities in Niagra Falls, New York and Telogia, Florida.  Meserole and Westbury move for summary judgment on these claims.  (Docket ## 198, 203.)  CSX and Marquette oppose these motions but do not move for summary judgment themselves.

---

[9] At oral argument, counsel for CSX stated that he was "not aware" of any tariff provision that would allow CSX to recover its disposal costs.  (Hearing Transcript, docket # 298, at 70-71.) The Court notes that in most cases, this issue would not arise because goods shipped in interstate transit usually have resale value.  In the event that a shipper refuses to take back its cargo on a lawful reverse-route, the carrier could simply forgo the reverse-route provision, notice the cargo for sale under 49 C.F.R. 1035, App. B., § 4(b), and sell the cargo on the open market.  In this case, that remedy was not available to CSX because the shippers' paper waste had no resale value at the time CSX sought to dispose of it.  (Woodward at 86-88, 95-96, 102-03.; Monopoli Affidavit at ¶ 24.)

The bill of lading is the "basic transportation contract between the shipper and carrier; its terms and conditions bind the shipper and all connecting carriers." *S. Pac. Transp. Co. v. Commercial Metals Co.*, 456 U.S. 336, 342 (1983). A bill of lading is subject to the same general rules of construction applicable to all other contracts. *EF Operating Corp. v. Am. Bldgs.*, 993 F.2d 1046, 1050 (3d Cir. 1993). To establish a breach of contract under Michigan law, the carriers must show that the shippers failed to perform a duty "imposed by a promise stated in the contract." *See Appalachian Railcar Sevrs., Inc. v. Boatright Enters., Inc.*, 2008 WL 828112, *33 (W.D. Mich. 2008); *see also Coates v. Bastian Bros., Inc.*, 276 Mich. App. 498 (Mich. App. 2007).

All bills of lading in this case identify the commodity shipped as "scrap paper." (*See* Marquette's Brief in Support, docket # 209, Exhibit H.) Each of the bills contains a legend stating:

> This material is not putrescible solid waste. It is the residual portion of source separated office paper waste recycling and is comprised of 99% paper, plastics and materials in a baled format.

(*Id.*) All parties agree that Meserole and Westbury were obligated to ship cargo that conformed to the description contained on the face of the bill of lading. Indeed, CSX Price Sheet 7273.805 states, "The description of the commodity(s) on the Shipping Document will conform to the Standard Transportation Commodity Code (STCC) Number(s)." (Monopoli Affidavit, docket #199, Exhibit 12; *see also* Marquette's Brief in Support, docket # 209, Exhibit H.)

There is sufficient evidence in the record for a reasonable fact-finder to conclude that the Meserole and Westbury shipments did not consist of "99% paper, plastics and materials in a baled format." The deposition testimony of those who witnessed the unloading of Meserole and Westbury cars reflects the presence of a wide variety of materials that do not fall within the description contained on the bills of lading. (*See, e.g.*, Seng Deposition at 38-40; Leavell Deposition at 13, 29;

29

Fortier Deposition at 23-24, 43-44; Conradson Deposition at 85; Hall Affidavit at ¶¶ 5-8.)  In fact, Meserole's own President, Rudolph Filiberto, testified that bales shipped by Meserole contained three to five percent textiles.  (Filiberto at 80.) Additionally, the specification sheet relied on by Meserole employees allowed for the inclusion of five to ten percent "miscellaneous" materials such as cans and wood.  This evidence, combined with the on-the-spot conclusions of the Michigan Department of Environmental Quality employees who observed Meserole and Westbury waste at C&V's yard would allow a reasonable jury to find for the carriers on their breach of contract claims.

Meserole and Westbury devote much of their briefing to arguing that their paper waste is not "solid waste."  This argument misses the point.  Even if the paper waste does not satisfy the legal definition of solid waste under Michigan or New York law, Meserole and Westbury still can be liable in breach of contract for failing to ship materials that conform to the description on the face of the bills of lading.  The shippers present no evidence to rebut the eye witness accounts of those persons who actually observed the waste, nor do they identify any other evidence in the record that would compel a fact-finder to conclude the cargo shipped was "99% paper, plastics and materials in a baled format."  As the moving parties, the shippers bear the burden of proving the absence of a genuine issue of material fact.  *Stratienko v. Cordis Corp.*, 429 F.3d 592, 597 (6th Cir. 2005).  The shippers fail to carry that burden here.  Thus summary judgment for the shippers is inappropriate.

## V.    CSX's and Marquette's Fraud Claims

Marquette and CSX claim Meserole and Westbury committed fraud by misrepresenting the nature of the cargo they were shipping to C&V in Manistee.  (CSX Second Amended Complaint, docket # 70, Counts V-VI; Marquette Amended Complaint, docket # 87, Counts VII-VIII.) Meserole and Westbury move for summary judgment on these claims.  (Docket ## 198, 203.)

30

The carriers' fraud claims are barred by the economic loss rule because those claims, and the remedies sought, are indistinguishable from their breach of contract claims. *See Rinaldo's Constr. Corp. v. Mich. Bell Tel. Co.*, 454 Mich. 65, 84 (1997). "The economic loss doctrine bars a party from recovering in tort economic losses suffered because of a breach of duty assumed only by contract." *TIBCO Software, Inc. v. Gordon Food Servs., Inc.*, 2003 WL 21683850 at *3 (W.D. Mich. 2003). In this case, the carriers' fraud claims are premised on statements contained on the face of the bills of lading – namely, the shippers' representations that the cargo shipped was "scrap paper" consisting of "99% paper, plastics and materials in baled format." Assuming *arguendo* that those statements are false, the carriers' remedy lies in contract, not tort. *See, e.g.*, *Convergent Group Corp. v. County of Kent*, 266 F. Supp. 2d 647, 660 (W.D. Mich. 2003) ("[T]he fraud claim would be barred because it simply alleges economic injury based upon Convergent's failure to comply with its contractual obligations.") Therefore, Meserole and Westbury are entitled to summary judgment on the carrier's fraud claims.

## VI.    Meserole's Carmack Amendment Claim

Meserole claims that CSX and Marquette are liable under the Carmack Amendment for damaging, losing, or misdelivering Meserole's paper waste. (Meserole Amended Complaint, docket # 85, Count I.) Meserole alleges it suffered approximately $575,000 in damages as a result of the carriers' actions. According to Meserole, that amount represents both the value of the paper waste, and the amount Meserole paid Vortex to dispose of that waste. (*Id.*, at ¶ 52.) CSX and Marquette move for summary judgment on this claim. (Docket ## 204, 208.)

The Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 11706, was designed "to create a national scheme of carrier liability for goods damaged or lost during interstate shipment

31

under a valid bill of lading." *Sompo Japan Ins. Co. of Am. v. Union Pac. R.R. Co.*, 456 F.3d 54, 58 (2d Cir. 2006). This federal regulatory scheme allows a shipper to recover from either the receiving or delivering carrier "the actual loss or injury" to the property shipped. 49 U.S.C. § 11706; *Am. Rd. Serv. Co. v. Consol. Rail Corp.*, 348 F.3d 565, 568 (6th Cir. 2003). To state a prima facie case under the Carmack Amendment, a shipper must establish that (1) the freight was in good condition at origin; (2) the freight was damaged at destination or lost in-transit; and (3) the shipper suffered monetary damages as a result. *Plough, Inc. v. Mason & Dixon Lines*, 630 F.2d 468, 470 (6th Cir. 1980); *Paper Magic Group v. J.B. Hunt Transp., Inc.*, 318 F.3d 458, 461 (3d Cir. 2003).

Meserole cannot state a prima facie case under the Carmack Amendment. As a threshold matter, Meserole fails to present any evidence that its paper waste was damaged at destination or lost in transit. All parties agree that all Meserole shipments were actually delivered to, or constructively placed with, C&V in Manistee. There is no allegation that any part of the Meserole shipments were lost in transit. Throughout the course of its various motions, responses, and replies, Meserole has implied that CSX and Marquette damaged the paper waste by allowing the loaded cars to sit outside on their railroad tracks. The record is devoid of any evidence that would substantiate this allegation. Meserole's assertion that its paper waste was damaged due to weather exposure is pure speculation. *Cf. American Road*, 348 F.3d at 569 ("Speculation, unsupported by facts in the record, is insufficient to create a genuine issue of material fact and falls short of what is required to survive summary judgment.").

Even if Meserole could establish that its paper waste was somehow damaged in transit, there is no evidence it suffered any damages as a result. The Carmack Amendment allows a shipper to recover the "actual loss" resulting from the carrier's negligence. 49 U.S.C. § 11706; *American Road*,

32

348 F.3d at 568. "Actual loss" is the difference between the market value of the goods at destination if timely delivered without damages and the market value of the goods as actually delivered. *Jessica Howard Ltd. v. Norfolk S. R.R. Co.*, 316 F.3d 165, 168 (2d Cir. 2003) (citing *Ansaldo San Giorgio I v. Rheinstrom Bros. Co.*, 294 U.S. 494, 496-97 (1935)). Meserole alleges "Carmack damages" in the amount of $575,000, but it concedes that its paper waste had no value at any time during the shipments. (Monopoli Affidavit, docket # 199, at ¶ 24.) Meserole alleges, without citation, that there now exists a resale market for low grade scrap paper waste. (*Id.*) But damages for lost or damaged cargo are measured at the time the goods are to be delivered. *Paper Magic Group*, 318 F.3d at 461; *see also Neptune Orient Lines, Ltd. v. Burlington N. & Santa Fe Ry.*, 213 F.3d 1118 (9th Cir. 2000). At the same time Marquette was actually or constructively delivering Meserole's paper waste, Meserole was paying Vortex $49 per ton to take that waste. Not only did the waste have no positive value at the time of delivery, it was actually a liability for whoever possessed it. Awarding Meserole damages based on a post-shipment market fluctuation would amount to a windfall profit; Meserole would get the benefit of free storage on the Marquette tracks when the waste was valueless, plus it would receive the full value of the waste when market conditions changed for the better.

Meserole attempts to sidestep the actual loss issue by arguing that its "Carmack damages" also represent the value of the money it paid to Vortex for the initial shipment. (Meserole Amended Complaint, docket # 85, ¶ 52.) Subject to limited exceptions, the Carmack Amendment does not allow recovery of freight charges. *See Marjan Int'l Corp. v. V.K. Putnam, Inc.*, 1993 WL 541204, at *13 (S.D.N.Y. 1993). One exception to the general rule is where goods are reverse-routed *and delivered* back to the original shipper. *Id.* at *14-15. This exception is premised on the notion that a shipper is entitled to receive the benefit of its bargain; if the shipper pays to have the goods shipped

but the goods never reach their destination and are returned to the shipper through the fault of the carrier, the shipper has not actually received any transportation service.  *Id.; see also Am. Nat'l Fire Ins. Co. v. Yellow Freight Sys., Inc.*, 325 F.3d 924, 931 (7th Cir. 2003) (noting that the purpose of damages under the Carmack Amendment is to put the aggrieved party in the same position the party would have been in had there been no loss or damage to the cargo).  This exception is inapplicable to this case because Meserole received the full scope of the service it claims to have paid for. Meserole paid Vortex to ship the paper off the Meserole lot.  Despite the myriad problems that followed, the waste left the Meserole lot and never returned.  Meserole received the full benefit of the shipment and it cannot recover freight charges paid to Vortex for that shipment because such charges do not represent an "actual loss."  *See id.*; *see also American National Fire*, 325 F.3d at 931. Accordingly, the Court holds that Meserole cannot establish a prima facie case under the Carmack Amendment.  CSX and Marquette are entitled to summary judgment on this claim.

**VII.    Meserole's Fraud Claim**

Meserole also asserts a fraud claim against CSX and Marquette.  (Meserole Amended Complaint, docket # 85, ¶¶ 67-76.)  Meserole's theory of relief is somewhat unclear, but it appears to allege that Vortex or Mr. Geber acted as an agent for CSX and Marquette in making various representations to Meserole.  CSX and Marquette move for summary judgment on this claim.

Meserole cannot establish a prima facie case of fraud because it cannot show that anyone at CSX or Marquette ever made any representations to anyone at Meserole.  *Cf. Nernberg v. Pearce*, 35 F.3d 247, 249-50 (6th Cir. 1995) (discussing the elements of a fraud claim under Michigan law). Meserole admits that it never had any contact with anyone at CSX or Marquette prior to or during the shipments relevant to this case.  (*See* Meserole Response to CSX, docket #232, at 14; Meserole

34

Response to Marquette, docket # 230, at 19.) Meserole's entire theory of relief is that Mr. Geber acted as the carriers' agent in orchestrating the shipping deals. There is no evidence in the record tending to show that Geber acted as an agent for CSX and Marquette. Meserole expressly conceded this point in its responses to the carriers' summary judgment motions, stating:

> At this time, the evidence established that Geber was CSX's customer. More would be needed to establish that fraudulent misrepresentations by Geber could be held against the railroads [CSX and Marquette]. Without further discovery, Meserole/Filco recognize that this additional evidence is not present at this time.

(Meserole Responses, docket ## 230, 232.)

Meserole's only proffered defense to the carriers' motions for summary judgment is its vague and unsupported assertion that CSX and Marquette have wrongfully withheld documents that would establish the agency relationship. Meserole brought a motion to compel these documents on November 18, 2008. (Docket # 195.) On January 14, 2009 Magistrate Judge Brenneman granted in part and denied in part Meserole's motion. (Docket # 273.) Since that time, Meserole has not come forward with any evidence, newly discovered or otherwise, that would establish the agency relationship underpinning its fraud theory. In responding to a properly supported summary judgment motion, the nonmoving party must come forward with "sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy." *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008). Meserole fails to meet that burden in this case, and thus CSX and Marquette are entitled to summary judgment on Meserole's fraud claim.

## VIII.  Vortex's Crossclaims Against Marquette

Marquette and Vortex are co-defendants in Meserole's Amended Complaint. (Docket # 85.) In its Answer to Meserole's Amended Complaint, Vortex asserted crossclaims against Marquette for "Breach of Contract and Breach of Duty." (Case No. 1:07-CV-985, docket # 171.) Vortex also

claims a right to indemnity or contribution from Marquette in the event it is found liable to Meserole. (*Id.*)  Marquette moves for summary judgment on these claims.  (Docket #210.)

The basis for Vortex's crossclaims is unclear.  Vortex seems to imply Marquette is liable in tort for failing to notify Vortex about the backlog of railcars in Manistee, but Vortex fails to cite any authority for the proposition that a receiving carrier has a duty to communicate with a shipper's agent or broker.  Moreover, Vortex fails to explain even the basic legal theory underpinning its indemnity and contribution claims.  Nevertheless, the Court finds that summary judgment is, at this time, inappropriate.  The evidence in the summary judgment record relates almost exclusively to the issue of how to allocate liability between the shippers and carriers.  There is relatively little evidence in the record concerning Vortex's relationship with the carriers.  More importantly, the Court's ruling on Meserole's liability under the bills of lading may significantly alter the arc of this case.  Under this Court's ruling today, Meserole no longer has a viable claim against Marquette.  Meserole may or may not choose to go forward with its tort and contract claims against Vortex.  Unless and until Vortex is forced to defend actively against Meserole, a final ruling on Vortex's crossclaims against Marquette and its other co-defendants is premature on this record.

**CONCLUSION**

Meserole and Westbury are liable, as a matter of law, for all expenses covered by the CSX and Marquette tariffs applicable to their respective bills of lading.  CSX and Marquette are entitled to recover all unpaid demurrage charges, and any unpaid freight charges actually attributable to the initial westbound movement of the freight or the subsequent reverse routing to New York.  CSX and Marquette also are entitled to summary judgment on all claims asserted by Meserole.  Meserole and Westbury are entitled to summary judgment only as to the fraud claims asserted by CSX and

36

Marquette, and not on the contract claims for non-tariff freight charges, and disposal and cleanup costs.  The Court will issue an order consistent with this opinion disposing of the particular motions at issue.  Any remaining claims will proceed to trial on the schedule provided in the most recent iteration of the Case Management Order.


Dated:      May 1, 2009             /s/ Robert J. Jonker
                                    ROBERT J. JONKER
                                    UNITED STATES DISTRICT JUDGE